COUNTY COMMISSIONERS OF PLYMOUTH *vs.* STATE
SUPERINTENDENT OF BUILDINGS & others[1]
(and five companion cases[2]).

Suffolk. December 3, 1980. — April 1, 1981.

Present: BRAUCHER, KAPLAN, WILKINS, & ABRAMS, JJ.

*Court House. County*, Lease of court house. *Commonwealth*, Lease of
court house. *Court Reorganization Act.*

In establishing the rent to be paid by the judicial branch for space in
county buildings, the State Superintendent of Buildings was required
by G. L. c. 29A, § 4, to take evidence on the costs of maintenance, re-
pairs, utilities and the annual debt service, make appropriate findings,
and equitably establish a rent to cover the costs. [266-267]
The State Superintendent of Buildings was not limited merely to allocat-
ing among the counties funds which had been appropriated for the
rental of space in county buildings for use by the judicial branch but
should have acted to "establish" the rent pursuant to the provisions of
G. L. c. 29A, § 4, even though any lease negotiated by the judicial
branch would be subject to the availability of appropriated funds.
[267-268]

APPEALS from a decision of the State Superintendent of
Buildings pursuant to G. L. c. 29A, § 4.

*Kevin F. Moloney (Paul J. Sullivan* with him) for the
plaintiffs.

*Paul W. Johnson,* Assistant Attorney General (*Carl
Valvo,* Assistant Attorney General, & *Michael F. Edgerton*
with him) for the defendants.

---

[1] The Chief Administrative Justice of the Trial Court and the Common-
wealth of Massachusetts.

[2] The plaintiffs in the five companion cases against the same defendants
are the city of Boston and the County Commissioners of the counties of
Barnstable, Franklin, Hampshire, and Middlesex.

BRAUCHER, J.   The State Superintendent of Buildings
(Superintendent), acting under G. L. c. 29A, § 4, es-
tablished $1.95 per square foot as the rent to be paid by the
judicial branch for quarters and space in county buildings
for the fiscal year beginning July 1, 1979 (FY 1980).   Five
counties and the city of Boston have appealed, asserting
both procedural and substantive errors.   We reverse the
Superintendent's decision and remand the cases for further
proceedings consistent with this opinion.

1. *Background.*   Before 1978 counties were responsible
for providing suitable court houses.   G. L. c. 34, §§ 3, 14,
as amended through St. 1965, c. 513.   See *McIntyre* v.
*County Comm'rs of Bristol,* 356 Mass. 520, 526 (1969).   Es-
timated costs for construction and repair of county build-
ings were included in county budgets.   G. L. c. 35, § 28, as
amended through St. 1971, c. 766, §§ 2, 3.   *District At-
torney for the S. Dist.* v. *County Comm'rs of Bristol,* 14
Gray 138, 140 (1859).   In 1976 the Governor's Select Com-
mittee on Judicial Needs reported that some court houses
were crowded while others had vacant court rooms and that
often "judges and non-judicial personnel labor under totally
inadequate physical conditions."   Report on the State of the
Massachusetts Courts 27 (1976).   See *Opinion of the
Justices,* 372 Mass. 883, 890 n.4 (1977).   To reduce waste
and correct deficiencies in the system, the Committee
recommended that there be a single Statewide budget and
that the Commonwealth take over full financial responsi-
bility for the administration of justice.   *Id.*

Those recommendations were adopted in the Court Reor-
ganization Act, St. 1978, c. 478.   The Legislature declared
its intention that there be a single State budget for the entire
judicial branch for FY 1980.   St. 1978, c. 478, §§ 333, 334.
G. L. c. 29A, inserted by St. 1978, c. 478, § 12, effective
July 1, 1978.   Until the Commonwealth took over full fund-
ing, the counties were to continue to pay for maintenance
and operation of the judicial system, but they were to be re-
imbursed. See *Keane* v. *City Auditor of Boston,* 380 Mass.

201, 206 (1980). The Commonwealth has not, however, assumed ownership of county buildings occupied by the judicial branch; instead, suitable quarters and space are to be rented by the judicial branch from the county. The matter is governed by G. L. c. 29A, § 4.[3]

2. *The proceedings.* The Chief Administrative Justice requested an appropriation of $13,667,824 for rental of court facilities for FY 1980, but the Legislature appropriated only $5,754,184. St. 1979, c. 393, § 2, Account No. 0330-2200. On June 22, 1979, the Chief Administrative Justice wrote to the counties, proposing that the buildings occupied by the judicial branch be leased at the rate of $1.40 per square foot. The letter arrived at a figure of $1.497 by subtracting "telephone expenses" and "existing trial court rental obligations" from the amount appropriated and dividing by the number of "estimated usable square feet." The letter then stated, "This office cannot

---

[3] As added by St. 1978, c. 478, § 12, effective July 1, 1978: "*Section 4.* Notwithstanding the provisions of section thirty-four of chapter thirty-five, suitable quarters and space as are now occupied or may in the future be occupied by the judicial branch in buildings owned by a county, city or town shall be rented by the judicial branch from such county, city or town and the rent paid shall be equitably established taking into account the cost of maintenance, repairs, utilities and the annual debt service provided or paid by such county, city or town with respect to such building; provided, however, that in no event shall the portion of the rent established on account of annual debt service paid on the building exceed a fraction, the denominator of which is the total square feet of usable floor space within the building and the numerator of which is the total square feet of usable floor space occupied by the judicial branch. In the event the parties are unable to agree to the rent that should be established, the state superintendent of buildings shall, after hearing if requested by either party, establish such rent, provided however that either party may appeal to the supreme judicial court. The chief administrative justice shall be responsible for negotiating leases between the judicial branch and other parties, subject to the approval of the chief justice of the supreme judicial court, and in compliance with laws and regulations governing state leases.

"Notwithstanding the provisions of this section, no payments for rent shall exceed the prevailing rent a commercial establishment would pay for comparable space in that geographic area, excluding that portion of said prevailing rent attributable to property taxes."

negotiate leases for an amount in excess of appropriated monies," and added that $1.40 "would allow for a small reserve to cover unforeseen telephone expenses or inaccurate estimates on square footage." Later, various counties filed with the Superintendent, pursuant to G. L. c. 29A, § 4, requests for hearings to establish the rent.

The Superintendent notified all the counties that a meeting would be held on April 2, 1980. Most of the counties, including all the plaintiffs in these cases, were represented at the meeting. Those attending were presented with a chart compiled by the Chief Administrative Justice, the Superintendent, and the Executive Office for Administration and Finance. For each county the chart showed (1) square feet, (2) rent at $1.95, (3) estimated revenue paid to cities and towns (mostly traffic and parking fines), (4) the total of the rent and revenue, (5) the total rent and revenue per square foot, (6) estimated fair rental values of comparable property per square foot, and (7) the excess of total rent and revenue per square foot over comparable fair rental values. According to the chart, the total State payments averaged $12.77 per square foot, well in excess of fair rental values except in Nantucket. No evidence was presented at the meeting. Each county was given an opportunity to comment on the chart and ten days to submit sworn information to the Superintendent. Objections were made to the notice of meeting, to the failure to hold an evidentiary hearing, and to the accuracy of the chart.

On June 19, 1980, the Superintendent announced his decision by letter, and these appeals followed. The $1.95 per square foot was arrived at in the same way the Chief Administrative Justice arrived at $1.497. The difference arises from changes in the estimates for telephone expenses, existing rental obligations, and number of square feet.

At argument in December, 1980, we were informed that funds appropriated to pay rent for FY 1980 had not been paid and would expire at the end of December, 1980. It was further represented that lease provisions for FY 1980, which had ended nearly six months earlier, could be agreed

upon without delay, except for the amount of rent. The counties claimed that the amount established by the Superintendent was inadequate, and there was no contention that it was excessive. Accordingly, at the request of the appealing counties, we issued an order on December 9, 1980, "pending decision by this court, that upon the execution of lease agreements for the fiscal year 1980, which may contain express provisions that the agreements are subject to the equitable establishment of rent and to the availability of appropriated funds, the chief administrative justice of the trial court may approve payments on account of rent under such lease agreements to the extent of available appropriations." We have since been informed that such lease agreements were executed and that payment was made to each county.

3. *The proper procedure.* Under G. L. c. 29A, § 4, the Superintendent is required to establish the rent in question "after hearing if requested by either party." Thus the proceeding is an "adjudicatory proceeding" as defined in G. L. c. 30A, § 1 (1). The Superintendent is an "agency" as defined in G. L. c. 30A, § 1 (2), and the counties are "persons" as defined in G. L. c. 30A, § 1 (4). When a hearing is requested, as it was here, G. L. c. 30A, §§ 10 and 11 must be followed. They were not.

4. *Amount of rent.* The statute provides that "the rent paid shall be equitably established taking into account the cost of maintenance, repairs, utilities and the annual debt service." If the parties are unable to agree to "the rent that should be established," the Superintendent is to "establish such rent." But "no payments for rent shall exceed the prevailing rent a commercial establishment would pay for comparable space in that geographic area, excluding that portion of said prevailing rent attributable to property taxes."

These provisions seem clear enough. General Laws c. 29A, § 1, provides: "All costs of maintenance and operation of the judicial branch shall be paid by the commonwealth." Hence "taking into account" such costs means in general that the rent will be sufficient to cover them, sub-

ject of course to the limitation to prevailing rent for a comparable commercial establishment. The Superintendent should have taken evidence on such costs, made appropriate findings, and "equitably established" rent which would cover the costs.

Rent so "established" could not actually be paid unless the Legislature appropriated the necessary funds. G. L. c. 29, §§ 26, 27. *Baker* v. *Commonwealth,* 312 Mass. 490, 492-493 (1942). Probably for that reason, the Superintendent appears to have misconceived entirely the function assigned to him by the statute. He undertook, not to establish the rent equitably, but to allocate the amount of an appropriation he apparently thought inadequate. No doubt it is within the power of the Legislature to credit parking fines paid to cities and towns against the rental payments to be made to counties, but the statute contains no hint of any such legislative intention.

5. *Lease negotiations.* The leases to be negotiated by the Chief Administrative Justice, under the statute, must be "in compliance with laws and regulations governing state leases." Leases are to some extent exempted from the requirement that no expense be incurred on behalf of the Commonwealth unless there has been an appropriation sufficient to cover it. G. L. c. 8, § 10A. *United States Trust Co.* v. *Commonwealth,* 348 Mass. 378, 383 (1965). But the lease statute only applies "if provision for rent of such premises for so much of the term of the lease as falls within the then current fiscal year has been made by appropriation." The Chief Administrative Justice and the Superintendent therefore properly assumed that they could not obligate the Commonwealth for any amount in excess of the available appropriation.

But this did not mean that negotiations could not go forward, or that the Superintendent could not act to "establish" the rent. Any lease and any decision of the Superintendent would be subject to the availability of appropriated funds, and no obligation would be imposed on the Commonwealth in excess of available appropriations,

and that fact should be made explicit in any agreement or decision in advance of appropriation. But if the amount of rent were "established" by agreement or by decision of the Superintendent, the parties would be in a position to call the attention of the Legislature to the need and to ask that a specific amount be appropriated. See *Adams* v. *County of Essex*, 205 Mass. 189, 195 (1910); *United States Trust Co.* v. *Commonwealth*, 348 Mass. 378, 384 (1965).

6. *Disposition.* The decision of the Superintendent is reversed and the cases are remanded to him for further proceedings consistent with this opinion.

*So ordered.*