COUNTY OF BARNSTABLE & others[1] *vs.* COMMONWEALTH.

Suffolk. December 5, 1995. - February 9, 1996.

Present: WILKINS, ABRAMS, LYNCH, O'CONNOR, GREANEY, & FRIED, JJ.

*Courthouse. County,* Lease of courthouse. *Commonwealth,* Lease of courthouse. *Court Reorganization Act. Constitutional Law,* Judiciary, Separation of powers.

In an action brought by several counties seeking declaratory relief and an order requiring the Commonwealth to pay the counties the full amount of contract rent due for leased courthouse buildings, despite the lack of appropriated funds sufficient to do so, the record did not adequately support the Superior Court judge's conclusion that the fiscal year 1991 courthouse expenditures of certain counties were "insufficient to maintain and service" those facilities in that fiscal year; further, whether available county resources were insufficient for subsequent years could not be determined on the basis of the 1991 data. [39-43]

This court declined to alter the opinions expressed in *County of Barnstable* v. *Commonwealth,* 410 Mass. 326 (1991) (*Barnstable I*), or to remand the same matter for further proceedings in the Superior Court, or, on the record presented, to exercise its inherent power to order the expenditure of unappropriated funds under the *O'Coin's* doctrine (*O'Coin's, Inc.* v. *Treasurer of the County of Worcester,* 362 Mass. 507 [1972]). [43-47]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on September 25, 1990.

On transfer to the Superior Court Department the case was heard by *Margot Botsford,* J., and on retransfer to the Supreme Judicial Court for the county of Suffolk, the case was reported by *Wilkins,* J.

[1]The original plaintiffs were the counties of Barnstable, Berkshire, Bristol, Dukes County, Essex, Franklin, Hampden, Hampshire, Norfolk, Plymouth, Worcester and the town of Nantucket (collectively, counties). Middlesex County, the only other county that leases courthouse facilities to the Commonwealth, did not join in the action. As the case progressed, the counties informed the Superior Court that Dukes County and Essex counties were no longer seeking relief in the action, and that Berkshire, Hampden, Hampshire, Plymouth, and Worcester counties no longer pressed claims related to events before 1993.

*Paul R. DeRensis (John Foskett* with him) for the plaintiffs.

*Judith Fabricant,* Assistant Attorney General *(Kristin E. McIntosh,* Assistant Attorney General, with her) for the Commonwealth.

GREANEY, J. On September 25, 1990, eleven counties and the town of Nantucket filed this action in the Supreme Judicial Court for Suffolk County pursuant to G. L. c. 211, § 3 (1994 ed.). The counties sought a judgment requiring the Commonwealth to pay them the full amount of contract rent for leased courthouse buildings, despite the lack of appropriated funds sufficient to do so. A single justice of this court denied the requested relief and ordered the case transferred pursuant to G. L. c. 211, § 4A (1994 ed.), to the Superior Court. On the counties' appeal, we affirmed the order of the single justice, and we directed the Superior Court to compile a record and to make findings on specified factual issues. *County of Barnstable* v. *Commonwealth,* 410 Mass. 326 (1991) *(Barnstable I).*

Following the transfer of the case to the Superior Court, the parties and the judge determined that it was not feasible to develop a record with respect to each county. They agreed instead to develop a record for two counties only, Bristol County and Norfolk County (Bristol and Norfolk) "on the understanding that the remaining plaintiff counties would be free to pursue further relief following and guided by the appellate disposition of the claims raised by Bristol and Norfolk." The parties also agreed to use fiscal year 1991 (FY 1991) as a test year,[2] and they proceeded to compile a record concerning the financial condition of the two counties for that year. A judge in the Superior Court considered the record that was ultimately developed,[3] and entered a comprehensive and thorough 140-page memorandum of decision (as amend-

[2]Like the Commonwealth's, the fiscal years of Bristol and Norfolk run from July 1 to June 30. The parties selected FY 1991 because it was the most recently completed fiscal year subsequent to the decision in *County of Barnstable* v. *Commonwealth,* 410 Mass. 326 (1991) *(Barnstable I),* and because the burden of collecting and presenting data for more than one fiscal year apparently was not feasible.

[3]The record consists of stipulated testimony, facts, exhibits and documents. The judge also admitted various documentary evidence submitted by both the Commonwealth and the counties concerning matters beyond FY 1991. The judge indicated that "[t]he reason for admitting the documents is not to replace or supersede the stipulated record relating to FY

ed), in which she concluded that Bristol and Norfolk had proved, on the basis of FY 1991 test year data with adjustments, that there was no potential source of funding to maintain their courthouse facilities at the level called for in their respective leases.

The case was subsequently retransferred to the Supreme Judicial Court for Suffolk County where a single justice reported to the full court the correctness of rulings made by the judge which were challenged by the parties and certain questions that needed consideration if we sustained the judge's conclusions that Bristol and Norfolk had proved their initial claims. We consider the report as bringing the whole case before us and as raising essentially questions of law for this court to decide. See *Aime* v. *Commonwealth*, 414 Mass. 667, 675 n.11 (1993). We shall first summarize the background provided by the *Barnstable I* decision, and the decision reached by the judge. We shall next conclude, contrary to the judge, that Bristol and Norfolk have not proved that they currently lack available resources which, when combined with rent that has been appropriated, leave them unable to maintain and service their courthouse facilities at the levels required by the leases. Finally, we shall comment on the difficulties inherent in seeking a solution to the problems posed by the case by means of continuing litigation, and, while leaving the litigation pending if further resort to it is needed, we shall address alternative approaches that might more appropriately resolve this stubborn controversy.

1. *Background.* In *Barnstable I*, we considered the statutory provisions governing the operation of county owned courthouses. As a result of the Court Reorganization Act of 1978, St. 1978, c. 478, courthouse space is leased by the counties to the Commonwealth at an amount of rent which is "equitably established taking into account the cost of maintenance, repairs, utilities and the annual debt service provided

---

1991 for the two counties. Rather, my purpose is simply to make these more recent data available in the record for whatever value they may have in assessing the validity of conclusions drawn from the information submitted for FY 1991." We reject the counties' arguments that additional documentary evidence submitted by the Commonwealth should not have been accepted by the judge. We also see no error in the judge's exclusion of certain chalks ("some graphs and chalks") offered by the counties. There is no reason to discuss these evidentiary rulings in any detail.

or paid by [each] county." G. L. c. 29A, § 4 (1992 ed.).[4] We construed the statutory scheme as requiring the counties to fund courthouse maintenance and related obligations to the extent that the Legislature failed to appropriate sufficient funds to pay the rent specified in the leases. *Barnstable I, supra* at 331-332, 335. We held that the Legislature has the power to impose such an obligation on the counties because the latter exist at the will of the Legislature, *id.* at 330-331, 335, and we concluded that the Commonwealth's acknowledged failure to pay the full amount of the equitable rent established under G. L. c. 29A, § 4, and the governing leases, gave the counties no right to relief.

Despite these limitations on the counties' rights, we went on to indicate that we would consider a narrow constitutionally based claim which each county could pursue, if it chose to do so, "on behalf of the judiciary." *Barnstable I, supra* at 327. This claim would present a constitutional challenge to the operation in that county of the legislative scheme for courthouse financing (namely, "rental reimbursement from the Commonwealth backed by the residual duties of the counties," *id.* at 332) as failing to provide funds sufficient "to maintain a minimally adequate court system." *Id.* at 330.

This theory, we indicated, would depend on each county's inability, despite its "exhaust[ion of all] available resources," *id.* at 334, to fund the difference between the reimbursement

---

[4]In 1992, G. L. c. 29A, § 4, was amended. See St. 1992, c. 379, § 1A. The quoted language no longer appears in § 4. Nothing turns on this revision.

*Section 4 sets out the procedures for arriving at the equitable rent.* Briefly, the counties submit to the Chief Administrative Justice (Chief Justice for Administration and Management [CJAM]) schedules of costs to maintain the courthouses which, when approved by the CJAM, are incorporated into leases subject to approval by the deputy commissioner of the division of capital planning and operations (DCPO). DCPO also has the authority to settle the amount of the equitable rent if there is a disagreement between the counties and the CJAM. Once the leases are approved, requests for appropriations to fund them are proposed and submitted to the Legislature.

As the judge observed, "as a matter of practice, the Trial Court has in effect established the contract rent for [the counties] each year at the level of each county's approved and accepted schedule of costs for the preceding year." The process does not involve any inquiry into the necessity of routine maintenance expenditures, nor, apparently, does it take into consideration the need for nonrecurring capital improvement projects.

it receives and the expenditures necessary for the particular facilities and services that are "essential to the fulfillment of the courts' obligations under the Constitution." *Id.* at 333. Thus, under this theory, although a shortfall in rent paid as compared to the contract rent has no particular legal significance, a shortfall between all of a county's available resources, including rent paid, and the costs of maintaining required facilities and services, might provide an occasion for exercise by the judiciary of its inherent powers. See *O'Coin's, Inc.* v. *Treasurer of the County of Worcester,* 362 Mass. 507 (1972). Because the record did not provide the facts necessary to evaluate the theory, we could not address it.

We also proceeded to identify two questions to be examined before the constitutional claim could be considered. First, whether any particular county's "available resources, combined with the rent appropriated by the Legislature, are insufficient to maintain and service the facilities occupied by the judicial branch at the contract level." *Barnstable I, supra* at 333. Second, if such an insufficiency is found, "which expenditures for county facilities and related services are essential to the fulfillment of the court's constitutional responsibilities." *Id.* at 334.

We directed the Superior Court to make findings on the first question, placing the burden of proof on the counties to establish any claimed insufficiency. *Id.* at 333. We identified a list of potential available resources to be considered as to each county, including "any general unappropriated balance," the "Capital Improvement Fund," the "Reserve Fund," the "Deeds Excise Fund," "possible savings in the discretionary areas of the budget," "additional borrowing capacity," and "additional levy capacity." *Id.* at 334. Only if a particular county met its burden of proof would the case proceed to the issue of which facilities are constitutionally required. We reserved the latter question to this court, *id.,* but directed the Superior Court to compile certain factual information concerning the question. *Id.* at 334-335.

2. *The Superior Court decision.* The judge understood her task as evaluating the ability of Bristol and Norfolk, at present, and for the foreseeable future, to make up the shortfall between the rent they receive from the Commonwealth and the cost of providing the contract level of courthouse facilities and services. Based on the parties' agreement, the judge

treated FY 1991 as an "historic test year," to be considered not as the object of the inquiry in itself, but rather as a basis for drawing conclusions about the present and future. Thus, the judge adjusted the counties' FY 1991 financial data to account for events that she found to be aberrational or not subject to annual repetition. The judge further adjusted the FY 1991 data to reflect determinations as to spending changes the counties could make, as compared to FY 1991, so as to free funds for courthouse use in future years. From this analysis, the judge drew conclusions about the present and future ability of Bristol and Norfolk to continue to provide the contract level of courthouse facilities and services.

In evaluating FY 1991 for Bristol and Norfolk, the judge began by determining the cost to each county of providing the contract level of facilities and services in that year.[5] The judge then considered whether, in order to bear that cost, either county had used "any measure that either could not be repeated or, if repeated over time, without other changes could be expected to lead to insolvency." Such measures, as identified by the judge, included the use of certain of the resources that we had identified in *Barnstable I* as among those to be considered, particularly general unappropriated balances, reserve funds, and borrowing capacity. Viewing these resources as nonrenewable, the judge treated them as unavailable for purposes of her calculations.

The judge then considered whether there were "other measures that [each] county could have taken or could take, to restructure its revenue receipts and expenditures in a way that would enable it both to pay for contractual courthouse services and to meet its other obligations on an ongoing

---

[5]In the case of Bristol, the judge concluded that the cost of providing the requisite level of facilities and services was established by the contract rent. See note 4, *supra*. In FY 1991, Norfolk's contract rent was set at $1,963,927 (adjusted for certain nonrecurring costs). Anticipating a shortfall in State funds, Norfolk spent only $1,471,951 in FY 1991 on courthouse maintenance and related services. Norfolk achieved these savings by laying off maintenance personnel and reducing routine maintenance services, and by cutting contractual services for items such as snow and ice removal, elevator and air conditioning maintenance, and trash removal. As to Norfolk, the parties disagree on which of the two figures previously mentioned should be used as a basis for determining the cost to the county of providing the contract level of facilities and services in FY 1991. The judge used the higher of the two figures. We shall discuss further the issues raised by this dispute.

basis." This part of the analysis focused on spending on discretionary functions by Bristol and Norfolk. The judge ruled that "any payment made by [a county] which does not further a legal mandate of the county must be considered discretionary and, as such, available as a potential source of funds for courthouse purposes." The judge reasoned that, because counties are creatures of the Legislature, "they are obligated to carry out the various mandates that the Legislature prescribes . . . . Programs that county officials establish and fund on their own do not stand on the same footing." On this basis, the judge found that both Bristol and Norfolk had funds that would have been available for courthouse use in FY 1991, but that had been spent instead on discretionary functions, such as the provision of engineering, social, and other, services. In Bristol's case, the judge identified $244,072 in available discretionary funds; in Norfolk's case, the judge identified $780,758 in available discretionary funds.

The judge then performed calculations based on the hypothesis that some discretionary spending could be converted to courthouse use, while certain other measures, such as borrowing in various forms, did not represent a realistic means of augmenting fiscal resources. This calculation yielded for each county a figure which the judge labeled "Net Operating Deficit After Adjustments," reflecting the amount by which each county fell short of being able fully to fund the difference between courthouse operating costs and rental payments received from the Commonwealth. With respect to Bristol, the judge arrived at a figure of $186,587, as that county's "Net Operating Deficit After Adjustments" in connection with the fulfillment of courthouse requirements. With respect to Norfolk, the judge's calculations arrived at a "Net Operating Deficit After Adjustments" of $96,858.

3. *Review of the judge's decision.* We turn now to the merits of the question whether Bristol and Norfolk have "establish[ed] that [their] available resources, combined with the rent appropriated by the Legislature, are insufficient to maintain and service the facilities occupied by the judicial branch at the contract level." *Barnstable I, supra* at 333. Each party has advanced specific objections to various aspects of the judge's decision. We find it unnecessary to treat each of these objections in detail, because we conclude that this question cannot

be answered by reference to data pertaining to the counties'
FY 1991 data.

The judge recognized that the test year approach to the
problem had inherent difficulties which made the approach a
less than reliable indicator of future fiscal status. She noted:
"[the] *Barnstable* [*I* decision] places on each county the
burden of proving that it has exhausted its available resources
and cannot adequately maintain the county's courthouses.
This is an ongoing obligation; if a test year approach makes
any sense at all, the value of a particular test year in terms of
offering a realistic picture of the county's finances is necessar-
ily time-limited." Nonetheless, the judge concluded that Bris-
tol and Norfolk had "proved, on the basis of [FY 1991] with
adjustments made to eliminate extraordinary or excessive
expenditures, that [they] had no potential sources of funding
available to maintain [their] courthouses at the level required
by the lease[s] with the Trial Court." This conclusion was
necessarily time based, since the underlying data was FY
1991 data, despite the judge's efforts to draw conclusions
about the future by excluding events that were aberrational or
not subject to annual repetition.

If we accept her reasoning, the judge's decision tells us ba-
sically that Bristol and Norfolk had small deficits in FY 1991.[6]
However, the deficiency found as to each county is pencil
thin. The Bristol deficit ($186,587) amounts to less than one-
half of one per cent of Bristol county's total FY 1991

---

[6]By endorsing the judge's finding that the counties demonstrated modest
operating deficits in FY 1991, we are adopting certain assumptions properly
made by the judge. In assessing the fiscal data presented by the parties, the
judge properly concluded that funds spent on certain discretionary func-
tions, such as the provision of engineering and social services, should be
considered available for the reduction of the counties' operating deficits. To
the extent the counties' lack of funds results from expenditures not
mandated by the Legislature, those funds must be considered available. The
fact that municipal representatives on a county's advisory board might
resist the legislative directive with respect to courthouses imposed by G. L.
c. 29A, § 4, is of no consequence.

The judge also properly discounted the effect of the Commonwealth's
late payment of the third-quarter rental payment for FY 1991, and
Norfolk's internal borrowing from its own special funds in FY 1991. While
these events might recur, they did not demonstrate any actual, long-term
shortage of cash on the part of the counties. The point of the exercise was
not to draw conclusions about the counties' actual financial situation in FY
1991.

expenditures ($37,688,053), and slightly more than seven per cent of its FY 1991 expenditures for courthouse operations ($2,592,298). The Norfolk deficit ($96,858) amounts to less than two-tenths of one per cent of Norfolk County's total expenditures for FY 1991 ($49,540,315), and about six and one-half per cent of its courthouse expenditures ($1,471,951). We are not convinced that the deficits found to exist by the judge have the probative force to bring into play the second step of the inquiry as to the courthouses in Bristol and Norfolk (a determination of "the extent to which the facilities and related services are reasonably necessary to the fulfillment of the court's constitutional duties," *Barnstable I, supra* at 333), and what doubtlessly will be time-consuming additional litigation by other counties which might result in a constitutional clash between two branches of government.

Most importantly, in our opinion, despite the judge's careful attempts to adjust the FY 1991 data for aberrational effect, her conclusion that Bristol and Norfolk faced modest deficits in FY 1991 does not tell us with any degree of certainty that these deficits were irremediable or necessarily likely to persist.[7] The parties' arguments about various particular budgetary components illustrate this point. For example, reasoning that the real estate market was depressed in FY 1991, and that this affected the income available to the counties for general county purposes, the Commonwealth contends that the judge should have adjusted revenue assumptions for Bristol and Norfolk to reflect abnormally low deeds excise receipts in FY 1991. In response, the counties assert that the "test year was not intended to include multi-year adjustments

---

[7]Here we note the judge's observation about Norfolk County's improving financial condition in FY 1992 and 1993.

"In contrast to Bristol, Norfolk's statements of receipts and payments for FY 1992 and FY 1993 indicate that at the end of each of those years, Norfolk had an operating surplus — the amount in its general unappropriated balance was greater at the end of the year than it was at the beginning. The record in this case obviously does not consider these later years in any meaningful way.

Accordingly, it does not permit me to draw any useful or factually supportable conclusions about Norfolk's general financial status in FY 1992 or FY 1993, or, more particularly, about the county's ability in those years to pay the costs required to maintain its courthouses at the level required by its lease. I make this observation about Norfolk's more recent financial status because it illustrates one of the substantial difficulties posed by this case."

for a volatile component such as annual deeds excise receipts."
Yet, without long-term projections in evidence concerning
deeds excise receipts and other items in the counties' income
streams, it cannot be concluded with certainty, on the basis of
FY 1991 data,[8] that the FY 1991 shortfalls of Bristol and
Norfolk will persist.[9]

The Commonwealth disputes the validity of an assumption
made by the judge concerning Norfolk's expenditures in FY
1991. In FY 1991, the contract rent established for Norfolk's
courthouse facilities, based on Norfolk's actual FY 1990
courthouse maintenance expenditures, was $1,963,927. See
note 5, *supra*. As was previously noted, Norfolk actually
spent only $1,471,951 on courthouse maintenance in FY 1991.
Reasoning that Norfolk's actual FY 1991 courthouse
expenditures could not have been sufficient to maintain
courthouse facilities in accord with the lease requirements,
the judge evaluated Norfolk's FY 1991 fiscal data as though
county expenditures had matched the FY 1991 contract rent.
Had she based her calculations on Norfolk's actual FY 1991
expenditures, taking into account discretionary funds which
could have been used for courthouse maintenance, she would
have concluded that Norfolk had a net operating surplus af-
ter adjustments in FY 1991.

While the judge's reasoning has some plausibility, we are
not persuaded that the record adequately supports the conclu-
sion that Norfolk's actual FY 1991 courthouse expenditures
were "insufficient to maintain and service the facilities oc-
cupied by the judicial branch at the contract level." *Barnst-
able I, supra* at 333. Certainly, there was no evidence that the
Commonwealth took action, as it could have under the stan-

[8]As another example of the shortcoming of this approach we note the
uncertainty in the record about the impact of the 1993 Education Reform
Act of 1993, St. 1993, c. 71, on current spending by Bristol and Norfolk on
their regional agricultural schools, which required significant county
expenditures in FY 1991.

[9]We continue to express "no view at this juncture as to whether the
counties and their constituent municipalities may be able to assert the limi-
tations imposed by G. L. c. 59, §§ 20A and 21C (1988 ed.) ('Proposition 2
$^1/_2$'), as a bar to [an] assessment to cover their obligation to provide
courthouse facilities. Nor do we assess the impact of St. 1990, c. 150, § 2,
item 1599-3658 (allowing counties to increase county taxes notwithstanding
G. L. c. 59, § 20A, if approved by two-thirds of cities and towns) on the
counties'·obligation to look to all sources of revenue to maintain the facili-
ties and services at the contract price." *Barnstable I, supra* at 334 n.6.

dard lease, to ameliorate deficiencies in the Norfolk facilities attributable to Norfolk's failure to provide maintenance services. It is common knowledge that many courthouses throughout the Commonwealth are dilapidated and substandard. This knowledge cannot serve as a substitute for an evidentiary record establishing the state of court facilities in Bristol and Norfolk. On the record before us, we cannot rule out the possibility that either or both of the counties could avoid operating shortfalls by adjusting maintenance expenditures while still maintaining the level of services called for in the leases by the judicious use of appropriated funds supplemented by county resources.[10] Further, the record establishes that in years subsequent to FY 1991, Bristol, like Norfolk, reduced its courthouse facility expenditures. What has been said about Norfolk's annual courthouse maintenance expenditures applies with equal force to Bristol's.

The counties commenced this litigation in 1990, asserting in their complaint that within the next six months, five of the plaintiff counties would become insolvent as a result of the Commonwealth's underpayment on the courthouse leases. See *Barnstable I, supra* at 332. We may take judicial notice that the anticipated insolvencies have not occurred. We do not doubt that the Legislature's failure to fund fully the courthouse leases has placed the counties in a difficult position, but, for the reasons explained above, we cannot conclude, on the basis of the FY 1991 data presented to, and analyzed by, the judge, that Bristol and Norfolk have carried their difficult burden of proving that they *currently* lack the resources to continue to provide court facilities and services at the levels required by the courthouse leases.

4. *The future.* (a) In their reply brief, the counties contend that the decision in *Barnstable I* should be revisited, and that we should conclude and declare, on the basis of the language in G. L. c. 29A, § 1 (1994 ed.) ("All costs of maintenance

---

[10]Our decision in *Barnstable I* does not distinguish between the services required in the standard courthouse leases, and the contract rental amount set each year by the CJAM, DCPO, and the counties. We have noted that the method used to establish the annual contract rent apparently does not involve an inquiry into the cost of providing the services specified in the standard courthouse leases. See note 4, *supra.* The record before us does not justify an assumption that expenditures at the contract rent level are necessary to provide the services specified in the standard courthouse leases.

and operation of the judicial branch shall be paid by the commonwealth"), that the counties cannot be required to contribute to the costs of courthouse maintenance. We decline to alter our long-standing opinion on this point. See *County Comm'rs of Plymouth* v. *State Superintendent of Bldgs.*, 383 Mass. 262 (1981). The Legislature's continuing refusal to appropriate funds sufficient to meet the contract costs of maintaining courthouse facilities must be viewed as a conscious decision by the Legislature to shift some of those costs to the counties. It cannot be doubted that the Legislature may do so. See *id.* at 267. See also *Barnstable I, supra* at 329, 335.

(b) The primary relief sought by the counties has been, and remains, entry of an order directing the Commonwealth to make immediate payment for each fiscal year from 1991[11] to the present in amounts equal to the shortfalls in those years between legislative appropriations and the contract rent established by the annual courthouse leases. In essence, the counties seek to hold the Commonwealth to its contractual undertakings by invoking this court's inherent power to order the expenditure of unappropriated funds to protect the operations of the judicial branch. Our "power to protect [the courts] from impairment resulting from inadequate facilities or a lack of supplies or supporting personnel," *O'Coin's, Inc.* v. *Treasurer of the County of Worcester*, 362 Mass. 507, 510 (1972), may be invoked only to remedy present, or to forestall future, disruption in the operation of the courts.[12] Any past unavailability of constitutionally adequate courthouse facilities cannot now be remedied by monetary damages. Nor, it is worth noting, may this court direct an equitable apportionment between the counties and the Commonwealth of the costs of courthouse maintenance.

The counties have voiced concerns about the time-consuming and burdensome effort of compiling the factual

[11]Or, in some cases, from 1992 to the present. See note 1, *supra.*

[12]We have noted previously that the counties suffer no legally cognizable harm when the Legislature fails to appropriate the full amount of the rent called for in the courthouse leases because the Commonwealth's contract obligation under the leases is expressly "subject to appropriation." *Barnstable I, supra* at 327 n.2. The counties also cannot claim monetary relief under G. L. c. 29A, § 4. That statute does not create any contractual obligations, and it does not appropriate any money for payment to the counties, nor does it obligate the Legislature to do so. *Id.* at 331-332.

record considered by the judge. We have concluded that the resulting record, containing primarily FY 1991 data, does not suffice to prove that the counties are currently unable to meet their obligations to contribute to the maintenance of courthouse facilities. In view of the inherent limitations on what the counties can hope to receive for their investment of time and scarce resources, we perceive no useful purpose in remanding this case for additional proceedings in the Superior Court.

The power to direct the spending of State funds is a quintessential prerogative of the Legislature. See *Barnstable I, supra* at 329. Thus, our inherent power must be exercised with caution and restraint. Resort to this limited power cannot remedy or modernize a cumbersome legislative scheme which divides the responsibility for providing court facilities and resources between two governmental divisions. Our inherent power also cannot serve to remedy deficiencies that cause some inconvenience, but fall short of actually impeding the public's right to access to justice. These are claims that should be addressed by the Legislature. In connection with this point, we note the pendency of legislation (1995 House Doc. No. 5311), entitled "An Act relative to the improvement of court facilities," which authorizes a bond issue of $583 million "to acquire, construct, renovate and repair courthouse facilities in the Commonwealth." Section 6 of the legislation mandates an inspection of all court facilities owned or used by the Commonwealth for the purpose of assessing conditions in those facilities, and assigning priorities to court facilities capital projects. The legislation sets out a systematic and workable plan for repairing and rebuilding deteriorating courthouses. It also extends to the year 2000 the counties' option to turn over court facilities to the Commonwealth. § 10. A legislative response offers the present best hope of resolving many of the issues raised by this litigation.[13]

Nonetheless, it remains clear that proof of deficiencies in

---

[13]In addition, G. L. c. 29A, § 6 (1994 ed.), establishes a court facilities council, consisting of the CJAM (or his designee), the presiding Administrative Justices of the trial courts (or their designees), a Justice of this court or the Appeals Court, five representative county commissioners of counties retaining ownership of court facilities, the librarian of the Social Law Library (or his designee), and a designee of Local 254, Service Employees International Union, Massachusetts Trades Building Council. Among other responsibilities, the council has the authority to monitor the compliance of

the physical plant, or in essential maintenance or security staff in a particular courthouse in one of the counties, would justify the exercise of our inherent power to ameliorate conditions in that facility. We have not had occasion to consider what deficiencies in court facilities would render them "inadequate" for the purpose of conducting a court's business. The *O'Coin's* decision, which is instructive on this point to a certain extent, establishes that an exercise of inherent power is proper when, by means of a relatively minor expenditure, the indefinite suspension of a criminal court session is avoided. The record considered by the judge lacks information that would enable us to ascertain whether conditions in a particular facility would warrant our intervention at this time. Because the method used to establish the contract rent for the counties, see note 4, *supra*, does not involve an inquiry into the conditions or deficiencies in a particular building, we cannot assume that the level of courthouse facilities and services required by the leases establishes the level of services "reasonably necessary to the fulfillment of [a] court's constitutional duties." *Barnstable I, supra* at 333. For the same reason, we cannot assume that reductions in the level of county spending on courthouse facilities and related services necessarily will result in constitutionally deficient facilities. See *Barnstable I, supra* at 335. We can foresee the possibility that conditions in a particular facility may deteriorate to the point that it becomes unacceptably difficult or hazardous to continue holding court sessions in all or part of a building, thereby presenting an occasion for consideration of the application of inherent power. We think such information would come, in most cases, from the judge or judges presiding in the facility alleged to have deficiencies of a constitutional magnitude,[14] who would be in a position to provide concrete information about

the counties with the courthouse lease requirements, and to report to the Legislature on instances of noncompliance that jeopardize the safe or effective use by the judiciary of a courthouse facility. There is disagreement among the parties whether the council presently is functional. If it is (or is not, but can be made) functional, the council offers another complementary resource for resolving the problems of inadequate court facilities.

[14]Within the recent past, the Chelsea Division of the District Court Department was closed by order of this court when its condition had deteriorated to the point that the facility was uninhabitable and had been condemned by local health officials. Conditions in a building need not be this dire before relief is sought. See generally *Smith* v. *Commonwealth*, 420 Mass. 291, 292 n.3 (1995).

the difficulties, or impossibility, of functioning in a particular court facility.[15]

The question of how we would proceed if proof of such a situation were forthcoming remains open. We could order the county to undertake, and pay for, the appropriate work. Also, as we observed in *Barnstable I, supra* at 335, "We [might decide] to order the Commonwealth to pay for those reasonably necessary facilities and services that cannot be fully financed by the appropriated rent and available county resources." We would, of course, order the provision of services constitutionally necessary to the continued performance of the judicial branch in the most efficient and least costly manner. We decline the Commonwealth's invitation to state or predict what a county's payment obligations might be. Those obligations might vary, depending on the nature of the problem identified in a particular facility.

5. *Conclusion.* The case is remanded to the county court for the entry of a judgment in accordance with this decision.

*So ordered.*

---

[15]If the presiding judge, or judges, in a particular facility concluded that they could no longer function in the conditions prevailing in a particular courthouse, we assume this information would be reported promptly to the responsible Administrative Justice and to the CJAM, as well as to county officials. This procedure is set forth in S.J.C. Rule 1:05, as appearing in 382 Mass. 704 (1981).