NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12121

DEPUTY CHIEF COUNSEL FOR THE PUBLIC DEFENDER DIVISION OF THE
COMMITTEE FOR PUBLIC COUNSEL SERVICES & another[1]  vs.  ACTING
FIRST JUSTICE OF THE LOWELL DIVISION OF THE DISTRICT COURT
DEPARTMENT.


Suffolk.     November 9, 2016. - May 24, 2017.

Present:  Gants, C.J., Hines, Gaziano, Lowy, & Budd, JJ.


Committee for Public Counsel Services.  District Court, Drug
    court session.



    Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on February 23, 2016.

    The case was reported by Duffly, J.


    Paul R. Rudof, Committee for Public Counsel Services (Ryan
M. Schiff, Committee for Public Counsel Services, also present)
for the plaintiffs.
    Bethany L. Stevens for the defendant.


    HINES, J.  This matter is before us on a reservation and

report, by a single justice of this court, of a petition for

_____

    [1] Deputy Chief Counsel for the Private Counsel Division of
the Committee for Public Counsel Services.

relief under G. L. c. 211, § 3.  The petition, brought by the Deputy Chief Counsel for the Public Defender Division of the Committee for Public Counsel Services and the Deputy Chief Counsel for the Private Counsel Division of the Committee for Public Counsel Services (collectively CPCS), sought an order affirming CPCS's independent authority under G. L. c. 211D to select and supervise attorneys for indigent defendants in the pilot program it had launched in the drug court session of the Lowell Division of the District Court Department (drug court). The issue arose after the Acting First Justice of the Lowell District Court (Justice), citing the need for a "team" approach to cases in the drug Court, removed CPCS attorneys from drug court cases to which they had been assigned and excluded CPCS attorneys from assignment to any new case in the drug court.

The single justice, in her reservation and report, observed that "the matter raises some important legal questions that ought to be decided by the full court, concerning specialty courts in general and adult drug courts in particular, and the respective roles and responsibilities of judges, [CPCS], and individual defense attorneys."  The issue highlights the tension that may arise between an attorney's duty to zealously advocate for the rights of the drug court defendant and a drug court model that favors a collaborative and nonadversarial approach to supervision of the drug court defendant.  We recognize that the

success of drug court outcomes depends in large part on an unconditional commitment to the goal of treatment from all members of the drug court team, including the drug court defendant.  Nonetheless, we conclude that CPCS has the sole authority under G. L. c. 211D for the assignment of counsel to indigent criminal defendants and that a judge may not override that authority to accommodate a preference for attorneys willing to assume a collaborative and nonadversarial role in drug court proceedings.

Background.  1.  The drug court model.  Drug courts have been developed to provide the option of treatment as an alternative to incarceration in cases where the underlying criminal behavior is thought to be motivated by a defendant's substance abuse.  Executive Office of the Trial Court, Adult Drug Court Manual, A Guide to Starting and Operating Adult Drug Courts in Massachusetts at 2-3 (2015) (drug court manual).  Drug courts are defined as "problem-solving courts that operate under a specialized model in which the judiciary, prosecution, defense bar, probation, law enforcement, substance use, mental health, and social service communities work together to provide treatment to people with substance use challenges" with the ultimate goal of public safety and reduction of recidivism.  Id. at 3.

To accomplish these purposes, drug courts necessarily are different from regular criminal sessions during which a judge may impose probation to accommodate a need for treatment rather than a sentence of incarceration. A defendant's success with substance abuse treatment in such circumstances more often than not depends on his or her self-motivation and the availability of resources to support the treatment alternatives. Drug courts, by contrast, are premised on the truism that successful treatment, though achievable, is difficult for a defendant with little more than sincere motivation and good intentions at his disposal. Thus, drug courts are distinguished from regular criminal sessions by the "integration of treatment and services with judicial case oversight and intensive court supervision." Id. at 39. In accordance with this formula for success, the drug court model incorporates features, described infra, not common in regular criminal sessions.

The structure of the drug court is informed by "evidence-based best practices" emphasizing the necessity of a team approach to the development and oversight of the defendant's prescribed course of substance abuse treatment. Id. at 3. A judge is the leader of the drug court team and, in that capacity, assembles the team which typically includes the "program coordinator, assistant district attorney, defense attorney, probation officer(s), clerk, case manager, specialty

court clinician, treatment providers, local law enforcement, and representatives from local organizations that provide services to drug court participants." Id. at 8. In keeping with the treatment purpose, team members must have expertise in substance use disorders and therapeutic options, and be sensitive to issues of gender, age, race, language, and cultural issues that may bear on the drug court defender's likelihood of success. Id. Collectively, the team members have the knowledge and experience to develop an appropriate treatment plan for each drug court defendant. Just as important, they are adept at identifying the personal and societal causes of failure and the ways to undercut their impact on the treatment goals.

The probation officer, clerk, and treatment providers are essential to the mission of the team. They are present at each drug court session, providing a consistency in the oversight of drug court defendants at each drug court session. Participation by the assistant district attorney and defense counsel is encouraged but not always possible. Defense counsel has no formal role in the drug court sessions because in the post-adjudicative setting, the drug court defendant has no right to counsel. However, if a drug court defendant is issued a probation violation notice, defense counsel is appointed and is expected to "zealously advocate for the rights of his or her client." Id. at 8.

The work of the drug court is accomplished during the weekly session over which the judge presides with the assistance of the other team members.  In preparation for each drug court session, the team is assembled for a "staffing," the purpose of which is to review the progress of each drug court defendant who will appear before the court that day.  Id. at 27.  During the staffing, the team determines whether sanctions are necessary.  However, if sanctions are to be considered, the discussion is deferred until defense counsel has been notified and given the opportunity to appear.  After the staffing, the formal drug court session is held with the defendant in attendance.  Only drug court cases are on the session docket.  During the session, the judge interacts personally with each drug court defendant and offers words of encouragement or praise.  The session is open to all drug court defendants scheduled to appear that day with the expectation that the opportunity to "see the consequences of others' actions [will] build[] a sense of mutual support among the participants."  Id. at 28.

In accordance with the drug court manual, drug courts are encouraged to have "clear, objective, and specific eligibility criteria" for admission.  Id. at 15.  Typically, a defendant must meet three eligibility criteria for admission to the drug court:  (1) the defendant must have a substance use disorder; (2) the defendant must have been found guilty, pleaded guilty,

or admitted to sufficient facts for a continuance without a finding; and (3) the defendant must have been placed on supervised probation.  Id.  An eligible defendant is entitled to the advice of counsel on the risks and benefits of drug courts.

Drug court defendants must agree to a one-year commitment during which they may be required to submit to "random and comprehensive drug and alcohol testing multiple times weekly, weekly meetings with the probation officer and attendance at a weekly or bi-weekly status hearing before the judge."  Id. at 21.  These conditions purposely are more demanding based on the underlying philosophy that drug court defendants must exhibit an unconditional commitment to engage in and comply with a rigorous substance abuse treatment program.  Id. at 19.  And, as with any probationer, the drug court defendant risks a violation of probation if he or she fails to comply with the conditions of probation.

2.  The pilot program in the Lowell drug court.  The drug court commenced operations in June, 2014, and from its inception, the Justice has been the judge with primary responsibility to oversee the court.  In July, 2015, CPCS initiated a drug court pilot program (pilot), which, in a departure from CPCS's long-standing policy, permitted the assignment of counsel to indigent drug court defendants for every stage of the drug court proceedings.  CPCS's policy was

driven by the legal principle that in the drug court postdisposition proceedings, drug court defendants had no right to counsel; the right to counsel attached only if the defendant was subject to a probation violation hearing. CPCS was constrained as well by budgetary considerations. No funding had been appropriated to defray the costs associated with the assignment of counsel to this class of defendants beyond the reach of the right to counsel provided by G. L. c. 211D.

The impetus for the pilot was a series of discussions that began in December, 2013, among CPCS, judges, and other representatives of the Administrative Office of the Trial Court. The advocacy for this expanded access to defense counsel was informed by the experiences of judges in other drug court sessions who touted the efficacy and desirability of assigned counsel at all stages of the drug court sessions. These judges and others involved in the management of the drug court sessions believed that a drug court defendant's likelihood of success in substance abuse treatment would be enhanced if defense counsel gained expertise in addiction issues and was familiar with the team's view of the defendant's participation. This pilot innovation permitted assigned counsel to participate in drug court "staffings" which ordinarily would not involve the presence of appointed counsel.

The pilot began after the Justice was notified by a letter dated July 15, 2015, of CPCS's proposal to locate the pilot program in the drug court. This letter advised that "the task of assuring counsel for participants already determined indigent in the trial session will be handled by our staff office and by Middlesex Defense Attorneys . . . just as is done in all court sessions." The record contains no evidence that the Justice rejected these conditions for the implementation of the pilot in the drug court.

Although the record does not establish the precise date on which the pilot commenced, disagreement between the Justice and CPCS attorneys surfaced on September 15, 2015, in an incident involving one of the CPCS attorneys chosen to participate in the pilot. It is not necessary to recite the details of that incident; the upshot was that the Justice removed the attorney from the assigned case and informed the attorney in charge of the CPCS office in the Lowell Division of the District Court Department that this attorney would not be permitted to represent probationers in the drug court. The Justice removed the attorney without specifying the reason or providing an opportunity for the attorney to be heard. On November 16, 2015, CPCS attorneys filed a motion for recognition of counsel and for the recusal of the Justice on behalf of the probationer who had been represented by the attorney removed by the Justice. On

December 10, 2015, the Justice issued a memorandum of decision, denying the motion as moot.[2]

On several occasions in December, 2015, the Justice declined to recognize previously assigned CPCS attorneys and appointed bar advocates as substitute counsel. Eventually the Justice announced a categorical ban on CPCS attorneys in the drug court, effectively terminating the drug court pilot. Although the Justice did not explain his reasoning for the categorical ban on CPCS attorneys, he later expressed the belief that CPCS attorneys in the Lowell office were "extremely hostile" to the drug court mission and that they refused to "participate fully" as team members.

Discussion. The petitioners argue that under G. L. c. 211D and S.J.C. Rule 3:10, as amended, 416 Mass. 1306 (1993), CPCS has independent authority to assign counsel to indigent criminal defendants and that a judge may not remove assigned counsel without notice and the opportunity to be heard, or categorically exclude CPCS attorneys from assignments in the drug court. The Justice concedes these limitations on a court's role in the assignment of counsel to indigent criminal defendants. He argues, however, that in the exercise of his authority to choose

---

[2] The issue became moot after the Justice readmitted the defendant to probation, thereby making the appointment of counsel unnecessary.

drug court "team" members and to insure fidelity to the drug court model, he may bypass the statutorily mandated system for assignment of counsel to give preference to volunteer "team" attorneys in probation violation cases. We do not doubt the desirability and efficacy of a collaborative and nonadversarial approach in the drug court, and we recognize its value in making the drug court an effective intervention for defendants who would otherwise recidivate because of their substance abuse issues. We conclude, however, that this purpose, laudable as it may be, cannot trump the statutory mandate that CPCS, not the court, is to assign counsel for indigent defendants.

When G. L. c. 211D was enacted in 1983, the Legislature had the benefit of decades of public advocacy for a "comprehensive, coordinated, and independent" system to insure an indigent criminal defendant's right to counsel. See Rosenfeld, The Right to Counsel and Provision of Counsel to Indigents in Massachusetts: The Hennessey Era, 74 Mass. L. Rev. 148, 148 (1989) (Hennessey Era). See also St. 1983, c. 673. That advocacy followed this court's decisions in Pugliese v. Commonwealth, 335 Mass. 471, 475-476 (1957) (recognizing right to counsel where defendant lacked sufficient intelligence to represent himself), and Brown v. Commonwealth, 335 Mass. 476, 482-483 (1957) (violation of art. 12 of Massachusetts Declaration of Rights where defendant was not represented by

counsel), both of which were decided well before the United States Supreme Court's landmark ruling in Gideon v. Wainwright, 372 U.S. 335, 339, 343-344 (1968).  In the aftermath of these decisions, the Supreme Judicial Court promulgated S.J.C. Rule 10, 337 Mass. 813 (1958), which required the appointment of counsel for indigent defendants in noncapital felony cases in the Superior Court.[3]

In 1960, the Legislature created the Massachusetts Defenders Committee, the first State-wide publicly funded defender agency.  St. 1960, c. 565.  Plagued by a shortage of resources, however, the defender's committee was unable to deliver on its mission to provide counsel to all indigent defendants eligible to receive the service.  Goodwin, Comment, Massachusetts' Struggle to Adhere to the Gideon Mandate:  Will the Lavallee Decision, Coupled With Legislative Reform, Finally Establish a State Indigent Criminal Defense System that is Constitutionally Sound?  32 New Eng. J. on Crim. & Civ.

---

[3] Rule 10 of the Supreme Judicial Court Rules, 337 Mass. 813 (1958), was amended three times thereafter.  In 1962, the rule was amended to allow the appointment of counsel in any case warranted by the circumstances. 345 Mass. 792 (1962).  In 1964, the rule was amended a second time to require the appointment of counsel in all cases where a sentence of imprisonment was a possible consequence of conviction.  347 Mass. 809 (1964)  In 1969, the court amended what was by then S.J.C. Rule 3:10 to require the assignment of the Massachusetts Defenders Committee unless exceptional circumstances dictated otherwise.  355 Mass. 803 (1969).  See 351 Mass. 791 (1967) (renumbering rules of Supreme Judicial Court).

Confinement 77, 84 (2006).  Twenty years after the creation of the defender's committee, it was still responsible for "less than one-half" of the cases of indigent criminal defendants.  Id. at 86-87.  The patchwork of county defender programs that operated as a complement to the defender's committee was itself inadequate to have any salutary effect on the system for the appointment of counsel for indigent criminal defendants.  Id. at 87.  Also, until the decision in Abodeely v. County of Worcester, 352 Mass. 719 (1967), private attorneys appointed under the authority of S.J.C. Rule 3:10 had no constitutional or statutory right to payment for their services.  Abodeely, supra at 723-724.

Concern about these and other serious shortcomings in the indigent defender system prompted then Chief Justice Edward Hennessey to establish a committee,[4] chaired by Associate Justice Herbert Wilkins (Wilkins Committee), to "set out guidelines and standards for defender programs, including such requirements as caseload controls, training, vertical representation and provision of support services."  Rosenfeld, Defense of Indigents

---

[4] The committee, officially named the "Committee on Appointment of Competent Counsel for Indigent Criminal Defendants in District and Municipal Courts" (Wilkins Committee), was established in 1976.  The Wilkins Committee released its interim report on December 16, 1976, and its final report on March 21, 1979.

in Massachusetts:  A New Approach, 28 Boston Bar J. Vol. 22, 22

(Nov./Dec. 1984).  See Hennessey Era, supra at 149.

Chief Justice Hennessey envisioned an indigent defender system

that was "centrally administered and financed . . . , within the

judicial branch but independent of the [c]ourt."  Id. at 151.

The Wilkins Committee issued reports in 1976 and 1979,

identifying the primary impediments to the system envisioned by

Chief Justice Hennessey as the lack of (1) a central

administrative and funding mechanism; (2) standards for quality

control; and (3) requirements for training and education.  Id.

at 149-150.  Armed with the work of the Wilkins Committee and

other advocacy groups supporting his vision, Chief Justice

Hennessey personally supported legislative initiatives intended

to accomplish this purpose.  Id. at 151.

Leading up to the enactment of G. L. c. 211D in 1983, the

Legislature also had the benefit of appellate cases documenting

abuses of the then-existing system for the appointment of

counsel to indigent defendants.[5]  Under that system, judges,

---

[5] See, e.g., Matter of McKenney, 384 Mass. 76, 77, 89, 101
(Appendix) (1981) (public censure and retirement of former judge
for misconduct including favoritism in appointment of counsel
for indigent defendants); Matter of Scott, 377 Mass. 364, 369-
370, 376-377 (Appendix) (1979) (censure for failing to ensure
that counsel was appointed for indigent party); Matter of Troy,
364 Mass. 15, 36, 73 (1973) (discipline for conditioning the
right to court-appointed counsel on defendant's surrender of
right to post bail).

despite the obvious constitutional conflict in exercising that role, had exclusive authority for the appointment of counsel.[6]

Against this historical backdrop, the Legislature enacted G. L. c. 211D in 1983, establishing CPCS as the sole statutory entity with the authority to "plan, oversee, and coordinate the delivery of criminal . . . legal services" to indigent defendants.  G. L. c. 211D, § 1.  General Laws c. 211D created a centralized agency with the responsibility for every aspect of the system for providing counsel for indigent defendants.  Id. That responsibility begins with the duty to establish, subject only to the approval of the Supreme Judicial Court, the indigency standards to be applied in determining a defendant's right to appointed counsel.  G. L. c. 211D, § 2.  For the benefit of those defendants qualifying for the appointment of counsel, CPCS is charged with the duty to oversee the "training, qualification and removal of counsel" who accept appointments as counsel for indigent defendants.  G. L. c. 211D, § 4.  Vested with this authority, CPCS has the ability to insure that indigent defendants have access to effective assistance of

---

[6] "The appointment of counsel by judges creates -- at the least -- the appearance that lawyers are being assigned cases to move dockets and that lawyers may be more loyal to the judge than to the client."  See Statement of Stephen B. Bright, Innocence Protection Act of 2001, Hearing before the Senate Committee on the Judiciary, 107th Cong., 1st Sess., on S.486, at 40 (June 27, 2001).

counsel.  The statute also has an egalitarian approach to the appointment of counsel, allowing that CPCS create a rotating appointment system to "encourage open access among attorneys participating within the private counsel division."  Id.  As explained, infra, the over-all statutory scheme addressed a range of issues that, prior to 1983, undermined the goal of a comprehensive and unified system for the assignment of counsel to indigent defendants.

The plain language of G. L. c. 211D, § 5, viewed in the context of the entire statutory scheme, supports for our conclusion that CPCS has sole authority to assign counsel to indigent criminal defendants.  The procedure in G. L. c. 211D, § 5, contemplates a two-step process for the assignment of counsel.  The first step is the determination of indigency, a duty within the exclusive authority of the judge.  Id.  The statute is clear that, in the second step, "A justice or associate justice shall assign a case to [CPCS]" (emphasis supplied).  Id.  This statutory division of authority between the judge and CPCS is reinforced in S.J.C. Rule 3:10, § 5, which provides that "the judge shall assign [CPCS] to provide representation for the party, unless exceptional circumstances, supported by written findings, necessitate the use of a different procedure that is consistent with G. L. c. 211D and the rules of this court" (emphasis supplied).  Therefore, we

discern no ambiguity in the respective roles of the judge and CPCS. The judge's role is to determine indigency and to assign the case to CPCS; the role of CPCS is to assign the case to an attorney with responsibility to represent the defendant.[7]

The Justice does not dispute this interpretation of G. L. c. 211D, § 5. Rather, he argues that we should recognize an exception for the drug court based on the need for the team approach deemed essential to the success of the drug court model. To the extent that the social science research validates the efficacy of a nonadversarial "team" approach in the adult drug court model, we take no issue with that proposition. Nonetheless, the statute provides no authority for a judge to craft an exception for a drug court, and the Justice cites none. As framed by the Justice, the judge, as the leader of the drug court team, may use his authority to select the team members to give preference to volunteer attorney "team" members in the appointment of counsel for probation violation matters. Although important, the authority to select team members is an administrative duty that must give way to the clear statutory duty of CPCS to assign counsel. Further, this exception to the

---

[7] According to CPCS, except for CPCS staff attorneys, CPCS does not assign individual attorneys to CPCS cases. Instead, CPCS contracts with the various county bar advocate programs which in turn make the assignments in accordance with the statutory mandate to fairly apportion the cases among available attorneys.

statutorily mandated procedure would effectively remove CPCS attorneys from the pool of attorneys in the drug court.  "The carving out of any exceptions to [a] clear [statutory] mandate is for the Legislature, not the judiciary."  D'Avella v. McGonigle, 429 Mass. 820, 822 (1999).

Conclusion.  Although we acknowledge and appreciate the important and special role of the drug court in achieving important public policy interests, we are constrained to follow the clear dictates of G. L. c. 211D and S.J.C. Rule 3:10, which vest CPCS with sole and independent authority to assign counsel for indigent defendants.  Where a drug court defendant who is indigent is alleged to have violated the terms of probation, the judge must appoint CPCS as counsel.  Counsel assigned by CPCS may be removed only for cause after a hearing.

So ordered.