NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13824

COMMITTEE FOR PUBLIC COUNSEL SERVICES[1]  vs.  MIDDLESEX AND
SUFFOLK COUNTY DISTRICT COURTS & others.[2]


Suffolk.     November 5, 2025. – March 16, 2026.

Present:  Budd, C.J., Gaziano, Kafker, Wendlandt, Georges,
Dewar, & Wolohojian, JJ.


Supreme Judicial Court, Superintendence of inferior courts.
     Constitutional Law, Judiciary, Separation of powers,
     Assistance of counsel.  Practice, Criminal, Assistance of
     counsel.  Attorney at Law, Compensation.  Committee for
     Public Counsel Services.  District Court.  Boston Municipal
     Court.


     Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on June 18, 2025.

     The case was reported by Wendlandt, J.


     Rebecca A. Jacobstein, Committee for Public Counsel
Services (Benjamin H. Keehn, Committee for Public Counsel
Services, also present) for the petitioner.

_____

     [1] On behalf of unrepresented defendants in Middlesex and
Suffolk Counties.

     [2] Boston Municipal Court; and district attorney for the
Suffolk district, intervener.

Marina Pullerits, Assistant Attorney General (Jennifer K. Zalnasky, Assistant Attorney General, also present) for Middlesex and Suffolk County District Courts & another.

Elisabeth Martino, Assistant District Attorney, for the intervener.

The following submitted briefs for amici curiae:

Shira M. Diner & Claudia Leis Bolgen for Massachusetts Association of Criminal Defense Lawyers.

Nicholas J. Louisa, Max D. Stern, Howard M. Cooper, & Shayla Mombeleur for Kenneth C. Allison & others.

Jessie J. Rossman, Jennifer M. Herrmann, & Matthew R. Segal for American Civil Liberties Union of Massachusetts, Inc., & another.


BUDD, C.J.  Bar advocates[3] have played a crucial role in the Commonwealth's criminal legal system for decades.  On May 27, 2025, many bar advocates stopped accepting assignments to represent indigent defendants to protest the rate of compensation, which is set by the Legislature.  The Committee for Public Counsel Services (CPCS or petitioner)[4] has asked us to determine whether, in light of the resulting shortage of defense counsel, State court judges are authorized to increase compensation rates for bar advocates above levels set by the Legislature.  Because we conclude that CPCS has not demonstrated the existence of extraordinary circumstances that would justify

---

[3] Bar advocates are private counsel who are paid by the Commonwealth to represent indigent criminal defendants.

[4] CPCS is the entity that administers the bar advocate program.

the judicial intervention it seeks, the requested relief is denied.[5]

Background. 1. The judiciary's role in administering public defense in the Commonwealth. In the early days of the Commonwealth's long history of appointing counsel to indigent criminal defendants, the judiciary led the way in administering the provision of public defense. This court began appointing counsel for capital defendants in the late Eighteenth Century, before the Legislature recognized a capital defendant's right to counsel in 1820.[6] See generally Carrasquillo v. Hampden County Dist. Courts, 484 Mass. 367, 371 & n.4 (2020). Most attorneys accepted such appointments without compensation until 1893, when the Legislature enacted a statute authorizing reasonable compensation for court-appointed counsel representing capital defendants. Id. at 371 & n.6.[7] Under the statute, expenses would need to be approved by the judge presiding over the case.

---

[5] We acknowledge the amicus briefs submitted by the Massachusetts Association of Criminal Defense Lawyers; 328 Massachusetts Bar Advocate Attorneys; and the American Civil Liberties Union of Massachusetts, Inc., and American Civil Liberties Union, Inc.

[6] General Laws c. 277, § 47, is the present-day version of the 1820 statute. See St. 1820, c. 14, § 8.

[7] The statute provided that reasonable compensation to and reasonable expenses incurred by counsel for defendants indicted for murder "shall be paid by the county in which the trial or other proceedings take place." St. 1893, c. 394, §§ 1, 2 (currently codified as G. L. c. 277, §§ 55, 56).

See St. 1893, c. 394, §§ 1, 2.  In 1958, this court expanded the right to counsel by promulgating a rule requiring appointment of counsel in all Superior Court noncapital felony cases and affirmed "the inherent discretionary power of any court to appoint counsel" in any other case.  S.J.C. Rule 10, 337 Mass. 813 (1958).  See Carrasquillo, supra at 372.  The rule was later amended to require counsel for indigent defendants facing imprisonment.  S.J.C. Rule 10, as amended, 347 Mass. 809 (1964).[8] Despite the expansion of the requirement for counsel, the Legislature did not explicitly provide additional statutory authority or funding for attorney compensation.  See Abodeely v. County of Worcester, 352 Mass. 719, 721-722 (1967) (discussing G. L. c. 277, §§ 47, 55, and 56, applicable to capital defendants only, as only existing statutes explicitly providing compensation for counsel).

Throughout most of the Twentieth Century, the judiciary continued to play a central role as the Commonwealth's public defender system evolved.  In 1960, the Legislature established the Massachusetts Defenders Committee (Defenders Committee), the first Statewide, publicly funded criminal defense agency.  See St. 1960, c. 565, § 1.  But the Legislature had yet to

---

[8] See Carrasquillo, 484 Mass. at 372.  The current version of rule 10 is S.J.C. Rule 3:10, as appearing in 475 Mass. 1301 (2016).

appropriate funds for court-appointed private counsel for noncapital defendants, and we held in 1967 that attorneys so appointed were entitled to compensation pursuant to G. L. c. 213, § 8, which authorized the courts to "allow accounts for services and expenses incident to their sittings" and order payment "out of the respective county treasuries." Abodeely, 352 Mass. at 722-724, quoting G. L. c. 213, § 8. The resource-limited Defenders Committee and the "patchwork of county defender programs" ultimately were unable to provide effective counsel to all indigent defendants entitled to representation. Deputy Chief Counsel for the Pub. Defender Div. of the Comm. for Pub. Counsel Servs. v. Acting First Justice of the Lowell Div. of the Dist. Court Dep't, 477 Mass. 178, 184 (2017) (Deputy Chief Counsel). In response, the Legislature in 1983 enacted G. L. c. 211D, thereby creating CPCS as a centrally administered and financed system for providing counsel to indigent defendants. See G. L. c. 211D, § 1. See also Deputy Chief Counsel, supra at 185-186.

The creation of CPCS shifted the responsibility of administering the public defender system away from the courts. CPCS became the "sole statutory entity with the authority to 'plan, oversee, and coordinate the delivery of criminal . . . legal services' to indigent defendants." Deputy Chief Counsel, 477 Mass. at 185-186, quoting G. L. c. 211D, § 1. The system

has two main components:  a public defender division composed of salaried public defenders, and a private counsel division that contracts with local bar advocate programs to supply private counsel (bar advocates) for indigent defendants not represented by the public defender division.  G. L. c. 211D, § 6.  CPCS is required to "maintain a system in which not less than [twenty percent] of indigent clients shall be represented by public defenders."  St. 2024, c. 140, § 2, line item 0321-1500.  The statute also requires CPCS to establish administrative requirements and performance standards governing all attorneys representing indigent defendants, and to provide training and supervision for those attorneys.  G. L. c. 211D, § 9.

In addition to centralizing the system for appointing counsel, G. L. c. 211D changed the way private attorneys were compensated by creating a centralized compensation scheme subject to legislative control.  See G. L. c. 211D, § 11.  The rate scheme went through a couple of changes over the years. From 1983 to 2005, G. L. c. 211D, § 11 (a) (§ 11 [a]), authorized CPCS to "establish rates of compensation" for bar advocates "subject to appropriation" of funds by the Legislature.  St. 1983, c. 673, § 2.  However, during this period, the Legislature repeatedly rejected the rates proposed

by CPCS and specified lower rates to be paid.[9]  See Lavallee v. Justices in the Hampden Superior Court, 442 Mass. 228, 231 n.8 (2004).  In 2005, the Legislature amended § 11 (a) establishing the system currently in place, in which the Legislature directly determines hourly rates for bar advocates.  St. 2005, c. 54, § 2.  The rates are subject to periodic review at public hearings that "shall take place" at least every three years.  G. L. c. 211D, § 11 (a).  Consistent with its pre-2005 practice, the Legislature appropriates funds specifically for bar advocate compensation in the form of a line item in its proposed annual budget.  See, e.g., St. 2019, c. 41, § 2, line item 0321-1510; St. 2023, c. 28, § 2, line item 0321-1510.

2.  The Lavallee protocol.  In 2004, CPCS brought a G. L. c. 211, § 3, petition on behalf of indigent criminal defendants who could not obtain representation due to a shortage of bar advocates in Hampden County.  Lavallee, 442 Mass. at 229-230.

---

[9] Appropriation acts from fiscal years 1998 to 2005 all maintained the following hourly rates:  thirty dollars for District Court cases, thirty-nine dollars for Superior Court nonhomicide cases, and fifty-four dollars for homicide cases. See, e.g., St. 1997, c. 43, § 2, line item 0321-1510; St. 1999, c. 127, § 2, line item 0321-1510; St. 2001, c. 177, § 2, line item 0321-1510; St. 2004, c. 149, § 2, line item 0321-1510. These rates were significantly lower than the amounts requested by CPCS.  In 2002, for example, CPCS set the rates at sixty dollars for District Court cases, ninety dollars for Superior Court nonhomicide cases, and $120 for homicide cases.  See The Spangenberg Group, Indigent Defense in Massachusetts:  A Case History of Reform 2 n.2 (Aug. 2005).

Although we acknowledged that low statutory rates for bar advocate compensation were a significant factor contributing to the shortage of counsel,[10] we declined to increase the rates in the circumstances presented, leaving that decision in the hands of the Legislature.  Id. at 229, 243-244.  However, recognizing that the lack of representation violated the defendants' constitutional right to counsel, this court devised what has become known as the Lavallee protocol to address the constitutional concern.  Id. at 246-247.

The Lavallee protocol established "presumptive time limits for the assignment of counsel."  Carrasquillo, 484 Mass. at 382.  The protocol requires courts to schedule "prompt status hearing[s]" for those defendants who have been detained for more than seven days and those whose cases have been pending for more than forty-five days.  Lavallee, 442 Mass. at 247-248.  At the hearing, a judge is required to determine whether, "despite good faith efforts of CPCS" and bar advocate programs "to secure representation for any such defendant, there is still no counsel

_____

[10] When Lavallee was decided in 2004, the authorized hourly rates were the same as those set in fiscal year 1998, see note 9, supra (thirty dollars for District Court cases, thirty-nine dollars for Superior Court nonhomicide cases, and fifty-four dollars for homicide cases).  St. 2003, c. 26, § 2, line item 0321-1510.  See Lavallee, 442 Mass. at 229-230.  In 2005, the Legislature increased the hourly rates to fifty dollars for District Court cases, sixty dollars for Superior Court nonhomicide cases, and one hundred dollars for homicide cases. St. 2005, c. 54, § 2.

willing and available to represent a defendant." Id. at 248. If the judge makes such a determination, he or she is required to release from custody any defendant who has been held for longer than seven days, and to dismiss without prejudice charges that have been pending for longer than forty-five days, until counsel is made available. Id. at 248-249. By authorizing release or dismissal of charges when good faith efforts to obtain counsel have failed, the Lavallee protocol balances the constitutional rights of indigent defendants with concerns for public safety. Carrasquillo, supra at 383.

The Lavallee protocol was invoked sixteen years later in Carrasquillo, 484 Mass. at 370, when this court again was confronted with a shortage of bar advocates in Hampden County. Having once more identified low compensation rates as the main driver of counsel shortages, we again declined the request to increase the rates in deference to the Legislature and instead implemented the Lavallee protocol. Id. at 392-394. We also clarified the process by which CPCS may seek to trigger the protocol in filing a G. L. c. 211, § 3, petition. Id. at 370, 389-391. Under Carrasquillo, a single justice of this court may issue an order imposing the protocol if they determine that, "despite good faith efforts by CPCS and the local bar advocate organization, there is an ongoing systemic violation of indigent criminal defendants' constitutional rights to effective

assistance of counsel due to CPCS's incapacity to provide such assistance through its staff attorneys or through bar advocates."  Id. at 390-391.

3.  Present litigation.  On May 27, 2025, many bar advocates in Suffolk and Middlesex Counties began refusing to accept new appointments because of the low hourly rates, which were then sixty-five dollars for District Court cases, eighty-five dollars for Superior Court nonhomicide cases, and $120 for homicide cases.  St. 2022, c. 126, §§ 96-100.  CPCS has reported that neighboring New England States all had higher minimum hourly rates.[11]  Partly due to the low rates, the number of bar advocates available has been in decline for several years, and Suffolk and Middlesex Counties struggled to fill duty day slots[12] even before the work stoppage.  CPCS also has reported that the line item for bar advocate compensation was not adequately funded to support the existing rates in fiscal year 2026 prior to the supplemental budget, see infra.

---

[11] CPCS reported the minimum hourly rates in other States in the region as follows:  eighty-eight dollars in Connecticut; $150 in Maine; $125 in New Hampshire; $112 in Rhode Island; and one hundred dollars in Vermont.

[12] Both public defenders and bar advocates sign up for duty days.  On a duty day, an attorney is assigned to a particular court for an entire day to accept appointments on behalf of indigent defendants, typically at arraignment.

In Suffolk and Middlesex Counties -- where the majority of bar advocates stopped taking new District Court cases -- arraignment sessions were unstaffed or understaffed, and a significant number of indigent criminal defendants were left without representation.  On June 18, 2025, CPCS filed an emergency petition pursuant to G. L. c. 211, § 3, on behalf of unrepresented defendants, seeking implementation of the Lavallee protocol in the Suffolk and Middlesex County District Courts[13] and the Boston Municipal Court (respondent courts or respondents).  The petitioner also sought "preliminary relief in the form of [temporarily] increased compensation rates."

At the time of filing, CPCS reported that there were almost 800 indigent criminal defendants without representation across the two counties, more than seventy of whom were in custody.  CPCS also stated that its own public defender division soon would reach capacity and therefore would not be able to bridge the gap created by the work stoppage.  Although the respondent courts did not oppose the implementation of the Lavallee protocol, they did oppose the petitioner's request for judicially ordered compensation rates, arguing that the latter would violate the separation of powers doctrine.  The district

---

[13] The District Court has twelve locations in Middlesex County and one in Suffolk County (Chelsea District Court).

attorney for the Suffolk district -- an intervener in the proceeding -- took the same position as the respondent courts.

On July 2, 2025, the single justice conducted an evidentiary hearing.  She found that the number of unrepresented defendants at the time of the hearing, which had already far exceeded those in Lavallee and Carrasquillo, would likely increase given, inter alia, CPCS's report that its public defender division soon would be unable to take on new cases.  The single justice also found that there was "a shortage of available defense counsel caused in large part by inadequate compensation rates."  She later stated that "[w]hether one views the present shortage . . . as resulting from the work stoppage or the inability to attract a sufficient volume of defense attorneys, . . . the root cause is the same:  the low rate of attorney compensation."

The single justice concluded that, despite CPCS's and local bar advocate organizations' good faith efforts, there was a "systemic violation of indigent criminal defendants' constitutional rights to effective assistance of counsel," quoting Carrasquillo, 484 Mass. at 391.  Accordingly, she ordered the implementation of the Lavallee protocol in the respondent courts.  The single justice also denied the petitioner's request for a rate increase without prejudice, noting that this court previously had deferred to the

Legislature when presented with similar requests. See id. at 393; Lavallee, 442 Mass. at 243.

In August 2025, the respondent courts asked the single justice to clarify that individual trial court judges are not permitted to order rate increases for attorneys who would agree to accept appointments. The request came after a District Court judge ordered that one hundred dollars per hour be paid to attorneys representing defendants whom the judge did not release following Lavallee hearings. Thereafter, on September 18, 2025, the single justice reserved and reported to the full court the question whether this or any court had authority to order increased rates in light of the shortage of counsel for indigent defendants.

4. Legislative action and recent developments. On August 5, 2025, the Legislature passed, and the Governor signed, a supplemental budget package that increased the rate of attorney compensation for District Court cases to seventy-five dollars as of August 1, 2025, and to eighty-five dollars as of August 1, 2026. St. 2025, c. 14, §§ 49-50, 104-105. This represented the largest rate increases for bar advocates since Lavallee.[14] The Legislature also appropriated $40 million for CPCS to hire 160

---

[14] Indeed, the increase was more than what CPCS had asked for in its budget request for fiscal year 2026.

salaried public defenders by the end of fiscal year 2026, and an additional 160 by the end of fiscal year 2027.  St. 2025, c. 14, § 2A, line item 0321-1599.  These additions would increase the size of CPCS's public defender division by about sixty percent.[15]

CPCS likewise took actions to address the counsel shortage.  Most notably, on October 20, 2025, CPCS began offering incentive payments to attorneys who accepted assignments in the respondent courts.[16]  CPCS reported that nearly one hundred attorneys had applied to accept more than 1,300 cases during the first ten days of the program.  As a result of its success, although scheduled to end on November 17, the program was extended to March 31, 2026.  As of February 24, more than 1,800 cases have been assigned counsel through the program.

During the time the CPCS incentive program has been in effect, the number of unrepresented defendants has decreased significantly, and the number of assignments taken by counsel has increased.  As of late December 2025, seventy-four percent of the defendants who were unrepresented at arraignment have had

---

[15] According to its website, CPCS currently has about 500 public defenders.  See https://www.publiccounsel.net /hr/divisions/#:~:text=Most%20representation%20is%20provided%20b y,in%20appeals%20of%20those%20case [https://perma.cc/78GF-CLJE].

[16] To minimize disruptions in other counties, the program required participating attorneys to fulfill two duty days in their home county by year's end.

counsel assigned, as compared to the twenty-five percent assignment rate reported in early August. In late February 2026, there were eight unrepresented indigent defendants in the respondent courts due to the counsel shortage. None of those defendants was in custody for more than seven days,[17] and no defendants in custody have required a seven-day Lavallee hearing since mid-October.

Discussion. The petitioner contends that, considering the recent dearth of counsel to represent indigent criminal defendants in Suffolk and Middlesex Counties, this court, a single justice of this court, or any justice of any trial court department may order increased compensation rates for bar advocates beyond those provided by the Legislature. We disagree. Because there is no evidence in the record that the Legislature's response to the shortage of counsel (including the rate increases for bar advocates and the authorized increase in CPCS staffing) and the incentive program developed by CPCS, together with the existing Lavallee protocol ordered by the single justice, are insufficient to maintain a constitutionally adequate court system, and because there has been no showing

---

[17] This number does not include defendants who were defaulted for failure to appear. Lavallee hearings are not scheduled for defendants in default.

that attempts at remediation have been exhausted, it would be inappropriate for the judiciary to order rate increases.

We begin with the obvious:  judicially ordered rates for bar advocates raise separation of powers concerns.  One of the most fundamental principles of government under art. 30 of the Massachusetts Declaration of Rights is that each of the legislative, executive, and judicial branches "shall never exercise" the powers of the other branches.  An act by one branch of the government violates art. 30 if it "unduly restrict[s] a core function of a coordinate branch" (quotation and citation omitted).  Commonwealth v. Gonsalves, 432 Mass. 613, 619 (2000).

"The power to direct the spending of State funds is a quintessential prerogative of the Legislature."  County of Barnstable v. Commonwealth, 422 Mass. 33, 45 (1996) (Barnstable II).  See Opinion of the Justices, 302 Mass. 605, 612 (1939) ("An underlying feature of our form of government is that the power to raise money, levy taxes and control the expenditure of public funds is vested in the General Court" [citation omitted]).  Indeed, "[h]owever difficult it may be to draw the line between legislative and other powers, there can be no doubt as to the side of the line upon which the power of appropriation falls."  Opinion of the Justices, supra at 613.  Choices regarding "how much money to spend and how to spend it are in

every instance political decisions" because of the Commonwealth's finite financial resources and competing policy priorities. Hancock v. Commissioner of Educ., 443 Mass. 428, 472 (2005) (Cowin, J., concurring). Thus, leaving the appropriation power in the hands of the Legislature ensures that popularly elected representatives, rather than the executive or the judicial branch, determine legislative policy. This is especially important "in times of limited fiscal resources."[18] County of Barnstable v. Commonwealth, 410 Mass. 326, 329 (1991) (Barnstable I).

By enacting G. L. c. 211D, § 11, the Legislature imposed extensive control over bar advocate compensation, exercising its prerogative to "make laws and appropriate funds." Carrasquillo, 484 Mass. at 370-371. Judicially ordered rates would encroach on both of these core legislative functions.

First, rates inconsistent with § 11 (a) would contradict a duly enacted statute and contravene the Legislature's policy determination as to the most appropriate rates for bar advocates. It is not within the judiciary's constitutionally

---

[18] The Commonwealth is currently facing a fiscally challenging environment with competing fiscal demands, widespread funding cuts, and significant uncertainty. See Press Release, Governor Healey Signs $60.9 Billion Fiscal Year 2026 Budget (July 4, 2025), https://www.mass.gov/news/governor-healey-signs-609-billion-fiscal-year-2026-budget [https://perma.cc/P4BU-FFCN].

circumscribed role to second-guess the Legislature's judgment as to the most effective system for the provision of public defense of indigent criminal defendants. Thus, any unilateral change by the judiciary to the legislatively designed compensation system requires exercise of considerable caution. Moreover, because the Legislature ties its appropriation for bar advocate compensation to the statutory rates it sets, increasing the rates would necessarily require funding beyond what has been appropriated for that purpose. We "cannot compel . . . an appropriation" without violating art. 30 "in the ordinary case." Bromfield v. Treasurer & Receiver Gen., 390 Mass. 665, 670 n.9, 672-673 (1983).

As it did during the Lavallee and Carrasquillo litigation, CPCS here urges us to exercise the judiciary's inherent power to order rates in excess of what the Legislature has set, and this court's general superintendence powers to order the disbursement of funds.

We agree with CPCS that the judiciary has "inherent common law and constitutional powers . . . to protect and preserve the integrity of the judicial system and to supervise the administration of justice." Shaw's Supermkts., Inc. v. Melendez, 488 Mass. 338, 339-340 (2021). Ancillary to these inherent powers, the judiciary has the authority "to protect [the] court from impairment resulting from inadequate facilities

or a lack of supplies or supporting personnel." O'Coin's, Inc. v. Treasurer of the County of Worcester, 362 Mass. 507, 510 (1972).

This inherent power is not contrary to, and is in fact rooted in, separation of powers: a properly functioning judiciary is constitutionally required. As an independent and coequal department of the government, "the judiciary must have adequate and sufficient resources to ensure the proper operation of the courts." O'Coin's, Inc., 362 Mass. at 510. Moreover, the Legislature cannot through its control over appropriation "prevent [the judiciary] from fulfilling its responsibilities to the people under the Constitution": the administration of justice. Id. at 511.[19]

However, we must exercise such power responsibly with "due consideration" for legislative prerogatives. Carrasquillo, 484 Mass. at 394, quoting O'Coin's, Inc., 362 Mass. at 515-516. Thus, we refrain from interfering with the Legislature's funding decisions in the absence of extraordinary circumstances, such as where the available funds are insufficient to maintain a constitutionally adequate court system, and even then, we would

---

[19] Indeed, our inherent power is not limited to remedying specific constitutional violations. Instead, it allows us to do that which is necessary to "protect the operations of the judicial branch." Barnstable II, 422 Mass. at 44. See Shaw's Supermkts., Inc. 488 Mass. at 339-340; O'Coin's, Inc., 362 Mass. at 510.

consider such action only after we have exhausted all "established methods" of remediation (citation omitted). O'Coin's, Inc., supra at 516 (only when "[established] methods fail . . . does occasion arise for the exercise of the inherent power" [citation omitted]).  See Barnstable I, 410 Mass. at 335 ("We may interfere with the Legislature's action only on proof that its decision results in insufficient provision for the judiciary's constitutionally required needs").

That is not the case here.  There is no dispute that the counsel shortage presents "a systemic problem of constitutional dimension."  Lavallee, 442 Mass. at 244.  It is equally clear that this court's power (whether framed as our superintendence power under G. L. c. 211, § 3, or our inherent power) not only allows -- but requires -- us to "fashion an appropriate remedy to the continuing constitutional violation suffered by indigent criminal defendants" in Suffolk and Middlesex Counties.  Id.  In present circumstances, we conclude that the Lavallee protocol provides a sufficient remedy.[20]

---

[20] As the entity responsible for the provision of public defense, CPCS also has significant responsibility in safeguarding defendants' right to counsel.  The Lavallee protocol recognizes this by requiring CPCS to demonstrate that it has made good faith efforts to secure counsel before the court can dismiss a case or releases a defendant for lack of counsel.  See Carrasquillo, 484 Mass. at 383.

The protocol is currently functioning as designed to protect the liberty interests of indigent criminal defendants affected by the work stoppage.  The respondent courts have been holding Lavallee hearings when required and working with CPCS to facilitate the assignment of counsel.  Indigent defendants for whom counsel could not be found after the presumptive time limits have been released and had their cases dismissed according to the Lavallee requirements.  Thus, there are presently no extraordinary circumstances that justify deviating from the traditional division of authority between the legislative and judicial branches.[21]  Cf. Barnstable II, 422 Mass. at 46 (refusing to order appropriation for court house repairs absent evidence that "conditions in a particular facility [had] deteriorate[d] to the point that it bec[ame] unacceptably difficult or hazardous to continue holding court sessions in all or part of a building"); O'Coin's, Inc., 362 Mass. at 517 (court-ordered purchase of recorder without prior appropriation warranted where "the only alternative . . . was to suspend the criminal sitting indefinitely").[22]

_____

[21] We note that CPCS's request to modify the Lavallee protocol is not within the scope of the question reserved and reported to this court by the single justice.

[22] CPCS has pointed to no Massachusetts authority supporting its contention that the judiciary has the power to order appropriation of funds outside of extraordinary circumstances. Most of the extrajurisdictional cases it cited involved State-

Further, there are pragmatic reasons to refrain from crossing the boundary of legislative authority to set attorney compensation rates. The Legislature made a decision to move away from the old model for compensating court-appointed counsel, in which individual judges set rates on a case-by-case basis and payments were made with little legislative oversight. Although "[i]t is not for this court to judge the wisdom" of a legislative policy, Mellor v. Berman, 390 Mass. 275, 283 (1983), we note that the uniform compensation system has several advantages over the previous one, including eliminating the risk of idiosyncratic rate setting and improving quality of service. See Deputy Chief Counsel, 477 Mass. at 185. We also note that, as with all funding decisions, determining the appropriate compensation rates for bar advocates is a matter of policy requiring the consideration of diverse factors, such as overhead costs, living expenses, market rates for comparable work, and incentive structure. The Legislature is in a better position

---

specific statutory fee caps that were held to be unconstitutional as they failed to offer just compensation to attorneys for services rendered to indigent defendants, thereby amounting to an unconstitutional taking. See Arnold v. Kemp, 306 Ark. 294, 305-306 (1991); People ex rel. Conn v. Randolph, 35 Ill. 2d 24, 30-31 (1966); State v. Lynch, 1990 OK 82, ¶¶ 27-28. The other case cited, Knox County Council v. State ex rel. McCormick, 217 Ind. 493, 513-514 (1940), involved a circumstance in which attorneys received no compensation at all. Attorneys' constitutional rights are not at issue here.

than the judiciary to gather and evaluate the information relevant to such determinations.

Indeed, the Legislature has recently acted. As mentioned above, in early August 2025, the Legislature passed a supplemental budget that increased bar advocate compensation rates and provided CPCS with significant resources to strengthen its public defender division. In doing so, the legislative branch has demonstrated its awareness of "defendants' constitutional right to counsel, and of the demands that right makes on the public treasury." Lavallee, 442 Mass. at 243. Additionally, the availability of counsel has substantially improved following the announcement of legislative action and CPCS's incentive program.[23] See supra. And CPCS acknowledged that access to additional public defenders may eventually resolve the counsel shortage. Given these fluid circumstances, increases to bar advocate compensate rates undertaken by the judiciary would be inappropriate.

We likewise reject CPCS's argument that, under the current circumstances, S.J.C. Rule 3:10, § 6, as appearing in 475 Mass.

---

[23] In a submission to the single justice in November 2025, CPCS represented that it did not believe there were "a significant number of attorneys holding out for increased compensation."

1301 (2016), authorizes individual judges to appoint counsel without CPCS involvement and compensate them at higher rates. Rule 3:10, § 6, allows a judge to use different procedures to assign counsel under "exceptional circumstances." CPCS contends that the Legislature's statutory rates are not binding for cases assigned through alternative procedures, because § 11 (a) applies only to counsel appointed through CPCS "in accordance with [G. L. c. 211D, § 6]." We are not persuaded. Trial court judges are subject to our superintendence authority. We have exercised that authority to implement the Lavallee protocol as a temporary, system-wide response to the exceptional circumstances created by the shortage of counsel, which is not particular to individual cases. The protocol does not allow individual judges to raise compensation rates in an effort to attract counsel, and nothing in rule 3:10, § 6, would authorize a judge to approve expenditures not covered by existing appropriations.

Conclusion. Because the petitioner has not provided evidence that the current statutory rates for bar advocates are insufficient to maintain a constitutionally adequate judiciary capable of protecting indigent criminal defendants' right to counsel, we decline to disturb the Legislature's funding decision. As we did in Lavallee and Carrasquillo, we defer to the Legislature "[a]s the representative branch in charge of making laws and appropriating funds" to determine the best

approach to administering and funding the Commonwealth's system for providing legal counsel to indigent criminal defendants. Lavallee, 442 Mass. at 243-244.  We remand the matter to the single justice for further proceedings consistent with this opinion.

So ordered.